# EXHIBIT 4



Wu Meng

And

Shanghai Zheyun Business Consulting Partnership (Limited Partnership)

Regarding

Beijing Dongfang Cheyun Information Technology Co., Ltd.

---

**Equity transfer agreement**

---

June 30, 2017

Exhibit 4
Page 19

Beijing Dongfang Cheyun Information Technology Co., Ltd.
**Equity transfer agreement**

This Equity Transfer Agreement (hereinafter referred to as this "Agreement") is entered into by and among the following parties (individually referred to as "Party" and collectively referred to as "Parties") on June 30, 2017 in Dongcheng District, Beijing, China:

**Transferee: Shanghai Zheyun Business Consulting Partnership (Limited and Partner) ("Zheyun")**

Address: 4th Floor, No. 416, Zhoushi Road, Pudong New Area, Shanghai

**Transferor: Wu Meng**

ID No.: 14237319730105507x

**Target Company/Company: Beijing Dongfang Cheyun Information Technology Co., Ltd.**

Address: 7th Floor, Building 1, No.1, No. 188, West South Fourth Ring Road, Fengtai District, Beijing (Park)

**The debtor of the loan package: LETV Holdings (Beijing) Co., Ltd. ("LETV Holdings")**

Address: 1102, 10th Floor, Building 3, No. 105, Yaojiayuan Road, Chaoyang District, Beijing

**The creditor of the loan package: Taoyun Capital Group Co., Ltd. ("Taoyun Capital")**

Exhibit 4
Page 20

Domicile:

**Actual Controller of LeEco: Jia Yueting**

ID No.:

Exhibit 4
Page 21

**Whereas:**

(1) Beijing Dongfang Cheyun Information Technology Co., Ltd. ("Target Company") is a limited liability Company established and validly existing under the laws of the PRC. The legal representative is Peng Gang. It was established on May 21, 2010. As of the date hereof, its registered capital is RMB 11 million. All shareholders have paid their contributions. The Target Company and Easy Go Ino. (Cayman) ("Easy Go") jointly serve as the intellectual property holder and operating entity of Easy Go Car Use ("Easy Go Group"), which is the e-commerce platform for providing scheduled car services.

(2) Wu Meng (the "Transferor"), a Chinese citizen, the controlling shareholder of the Target Company and the related party of **LETV Holdings**, legally holding 66.67% of the equity of the Target Company.

(3) Shanghai Zheyun Business Consulting Partnership (Limited Partnership) ("Transferee" or "Zhe Yun") is a limited partnership legally established and validly existing under the laws of the PRC.

(4) **LETV Holdings** (Beijing) Co., Ltd. ("**LETV Holdings**") is a limited liability Company established and validly existing under the laws of the PRC. **LETV Holdings** is the debtor of the package loan as described in Article 2.02(b) of this Agreement. .

(5) Jia Yueting, as the actual controller of **LETV Holdings** and other related entities ("Actual Controller of LeEco"), directly or indirectly controls including but not limited to, **LETV Holdings** (Beijing) Co., Ltd., LeEco Mobile Intelligent Information Technology (Beijing) Limited Company, LeEco Sports Industry Development (Beijing) Co., Ltd., Lele Interactive Music Culture Development (Beijing) Co., Ltd., LeEco Music Culture Industry Development (Beijing) Co., Ltd., Beijing Bairui Culture Media Co., Ltd., and Lucky Clover (the above-mentioned companies directly or indirectly controlled by the Actual Controller of LeEco are collectively referred to as "LeEco Related Entities".

(6) Taoyun Capital Group Co., Ltd. ("Taoyun Capital") is a limited liability Company legally established and validly existing under the laws of the PRC. The legal representative is Wen Xiaodong.

(7) The Transferor intends to transfer 66.67% of the equity of the Target Company (the "Target Equity") held by the Transferor to the Transferee in accordance with the terms and conditions of this Agreement, and the Actual Controller of LeEco shall procure Lucky CloverLimited   ("Lucky Clover"), the controlling shareholder of Easy Go, to transfer its 66.67% equity interest in Easy Go ("Easy Go Equity") to the designated overseas affiliates of Yunyun Capital and separately sign the corresponding overseas equity transfer agreement.

Exhibit 4
Page 22

(8) Taoyun Capital and its related parties have reached consensus with the Actual Controller of LeEco and the LeEco Related Entities on payment of the consideration for the Target Equity and Easy Go Equity by deduction of the part or all of the claims in the package loans (collectively referred to as the "Transaction").

In view of this, through friendly consultations, based on the principle of equality and mutual benefit and in accordance with the Contract Law of the People's Republic of China, the Company Law of the People's Republic of China and other relevant laws and regulations, all Parties have reached this Agreement on the above-mentioned equity transfer and payment of the consideration for the Transaction contemplated hereunder using the related claims in the package loans as follows.

### Article 1 Equity Transfer

### Article 1.01 Valuation of Easy GoGroup

Prior to this Transaction, the Transferor, the Transferee, Taoyun Capital, the Actual Controller of LeEco, and the LeEco Related Entities agreed that Easy Go Group was valued at US$660 million as of the signing date hereof (converted to RMB 4.488 billion yuan according to the exchange rate of 1 USD to RMB 6.80 yuan) on the premises that the Transferee shall complete the due diligence as described in Article 1.02(b) hereof and there is no significant adverse event that would affect the Transaction after the signing of this Agreement.

### Article 1.02 Transaction Consideration, Due Diligence and Transaction Consideration Adjustment

(a) Transaction Consideration:

The equities to be transferred in this Transaction includes 66.67% of the equity of the Target Company legally held by the Transferor (the "Target Equity") and 66.77% of the equity of Easy Go legally held by Lucky Clover, the controlling shareholder of Easy Go ("Easy Go Equity"). The Transferee agreed to acquire for the total consideration (the "Transaction Consideration") of US$ 440 million (converted to RMB 2.992 billion yuan at the exchange rate of 1 USD to 6.80 yuan).After the completion of the Transaction the Target Equity will be held by the Transferee and the equity of Easy Go will be held by the designated affiliates of Taoyun Capital. However, after the signing of this Agreement, the Transferee will complete the independent due diligence, and the effectiveness of this Agreement shall be preconditional upon non-existence of material adverse impact on the Transaction.

(b) Due Diligence:

Exhibit 4
Page 23

After the signing of this Agreement, the Transferee will conduct a comprehensive legal and financial due diligence ("Due Diligence") on the Ease Group, and the Transferor, the Target Company, and the Actual Controller of LeEco undertake to provide all necessary due materials and assistance in the due diligence, including the financial forecast data of Easy Go Group for the following 3 years.

(c) Adjustments to Valuation of Easy Go Group and Transaction Consideration:

As of the signing date of this Agreement, the Transferor, the Target Company, and the Actual Controller of LeEco guarantee that the total debt of the Easy Go Group that has been fully disclosed shall not exceed RMB 2.3 billion. The Transferor, **LETV Holdings** and the Actual Controller of LeEco shall be jointly and severally liable for the outstanding debts of Easy Go Group exceeding RMB 2.3 billion, including but not limited to outstanding bank loans, private loans, other arrears or any contingent liabilities (collectively referred to as "Excess Unliquidated Liabilities").In such case, according to the professional advices of intermediary agency, the Transferee may adjust the valuation of the Easy Go Group and the considerations for the Target Equity and the Easy Go Equity, and deduct the corresponding amount from the Transaction Consideration paid by the Transferee, or recover the amount from the relevant jointly liable person.

### Article 2 Closing

### Article 2.01   Time and Location of Closing

(a) The Parties shall sign this Agreement on the date fist written above in Dongcheng District, Beijing, China.

(b) Within 45 working days after this Agreement is signed and comes into effect, the changes in the industrial and commercial registration for the equity transfer shall be completed.

(c) After this Agreement is signed and comes into effect, the Transferee shall cancel the creditor's rights and debts and make payment to the Target Company on the date and in the method specified in paragraphs 2.02-2.03 hereof on the premise of satisfying the conditions stipulated herein. ("Payment")

### 2.02   Deduction of Transaction Consideration

The Transaction shall be a debt-based acquisition, and the consideration for the Transaction is divided into two parts:

(a) The first part of the Transaction Consideration is in the form of debt commitment, and the Transferee agrees to bear the total debt of the Easy Go Group

Exhibit 4
Page 24

not exceeding RMB 2.3 billion. After the completion of the change in the registration for equity and the industrial and commercial registration change for the Target Equity transfer and the Easy Go Equity transfer, the Transferee shall be deemed to have assumed the debt.

(b) The second part of the Transaction Consideration is in the form of credit deduction, Taoyun Capital and its related parties and the Actual Controller of LeEco and the LeEco Related Entities agree to deduct the consideration for the Transaction in the amount of RMB 692 million using the claims contained in the package loans totaled RMB 692 million yuan. After this Agreement is signed and becomes effective, the above claims are deemed to have been deducted.

(c) The Transferor and the Actual Controller of LeEco hereby clarify and confirm that after the completion of the above two parts, the Transferee shall be deemed to have paid the full consideration for the Transaction.

### Article 2.03 Payment Arrangements for Target Company

With respect to the debt commitment under Article 2.02(b) of this Agreement, in order to solve the problem of insufficient operating cash flow of the Target Company within the Easy Go Group, the Transferee will provide money to the Target Company in several installments, the specific payment time of which shall be negotiated separately by the Transferee and the Target Company. However, the first installment of 430 million yuan shall be paid within 2 working days after the signing of this Agreement.

The designated collection account under the Target Company name is as follows:

> Account Name: Beijing Dongfang Cheyun Information Technology Co., Ltd.
> Bank: Ping An Bank Shanghai Anting Branch
> Account No.: 11015642476000

The Target Company shall guarantee that the money paid according to this Article shall be used for paying off the total debts of the Easy Go Group not exceeding RMB 2.3 billion. At the same time, the debt owed to the third party other than the Transferor, the Actual Controller of LeEco and LeEco Related Entities as included in the above-mentioned total debts shall be given the highest priority for settlement ("Third Party Debt"). No payment shall be made to the Transferor, the Actual Controller of LeEco and LeEco Related Entities until the third party debt is fully settled.

### Article 2.04 Fees and Taxes

(a) The relevant expenses of this Transaction shall be borne by each Party respectively.

Exhibit 4
Page 25

(b) Each Party shall, in accordance with applicable law, bear the taxes in connection with the Transaction, except that the Party shall perform the withholding obligation in accordance with the law (however, when asserting and actually performing the withholding obligation, one Party shall provide legal evidence in advance and obtain the consent of other Parties).

### Article 3 Change in Target Equity and Easy Go equity

### Paragraph 3.01 Capital Increase

The Transferor or **LETV Holdings** shall complete the industrial and commercial registration for the Target Company's capital increase of US$230 million from this Agreement is signed and becomes effective until the fulfillment of paragraphs 3.02 and 3.03 of this Agreement.

### Article 3.02 Industrial and Commercial Registration Change Related to Target Equity

Within forty-five working days after this Agreement is signed and becomes effective, the Target Company shall complete the industrial and commercial registration change related to the equity transfer at the industrial and commercial registration authority, and obtain the new Business License for Enterprise Legal Person of the Target Company after the completion of the industrial and commercial registration change, a copy of which (bearing the official seal of the Target Company) shall be submitted to the Target Company.

The Parties shall provide appropriate assistance in the course of the industrial and commercial registration change (if needed).

### Article 3.03 Industrial and Commercial Registration Change Related to Easy Go Equity

Within three working days after this Agreement is signed and becomes effective, the Parties shall prompt the designated overseas affiliates of Taoyun Capital, Lucky Clover and the Actual Controller of LeEco to complete the signing and entry into force of the overseas equity transfer agreement, and complete the industrial and commercial registration change related to the Easy Go Equity within the time limit specified in the overseas equity transfer agreement.

The Parties shall provide appropriate assistance in the course of the industrial and commercial registration change (if needed).

### Article 4 Equity Repurchase

Exhibit 4
Page 26

### Article 4.01 Equity Repurchase

Upon reaching consensus among the interested parties such as the designated overseas affiliates of Taoyun Capital, the Transferor, and the Actual Controller of LeEco, the Transferor may require to repurchase part or all of the equity at the agreed reasonable price and at the time approved by the Parties (provisional 15% annual interest rate)   ("Repurchase").

### Article 5 Representations and Warranties of the Transferor

Article 5.01 The Transferor is a person with full capacity for civil conduct.

**Article** 5.02 The Transferor has all the necessary powers, authorizations and capabilities to sign and deliver all transaction documents, fulfill its obligations under this Agreement and other transaction documents, and assume legal liability for the legal consequences. Each transaction document, once being signed and delivered, shall constitute a valid and legally binding obligation to the Company and its existing shareholders and may be enforced in accordance with its respective terms.

**Article** 5.03 The Transferor hereby represents and warrants to the Transferee that, unless otherwise stated in advance, the Transferor's representations are true, accurate and complete in material terms as of the date of this Agreement.

Article 5.04 The Transferor shall promptly obtain the resolution documents of the Company related to the equity transfer specified in this Agreement, and the legal documents on waiver of the right of first refusal that by other shareholders.

Article 5.05 The Transferor is the legal owner of the Target Equity, and no pledge or other security interest or any other third party rights have been created on the Target Equity.

Article 5.06 As of the signing date of this Agreement, except as disclosed to the Transferee by the Transferor, there is no situation that causes or may cause tax disputes, tax penalties or relevant judicial proceedings against the Transferee; the Target Company has not been involved in any disputes, punishments or judicial proceedings, including but not limited to any litigation, arbitration, administrative proceedings, enforcement measures or enforcement proceedings; there are no undisclosed Excess Unliquidated Obligations to be assumed by the Target Company and no cause of the above-mentioned obligations; the tax penalties, litigation, arbitration, administrative proceedings, enforcement measures, coercive measures, and Excess Unliquidated Obligations arisen prior to the date hereof shall be settled by the Target Company, however, the liability and damages for the Target Equity arising therefrom shall be borne by the Transferor.

Exhibit 4
Page 27

Article 5.07 The execution, delivery and performance of this Agreement and being a Party to this Agreement shall not violate or contravene any laws, regulations or government directives applicable to any of its assets, property or business.

## Article 6 Representations and Warranties of the Transferee

Article 6.01 The Transferee is an enterprise legal person established and validly existing according to law, and has the qualifications and rights of civil subjects that are compatible with the conclusion and performance of this Agreement. Once being duly authorized, signed and delivered by the Parties, this Agreement shall constitute a legal, valid and binding obligation to the Transferee and may be enforced in accordance with the terms hereof. The Transferee is not subject to any bankruptcy, restructuring, insolvency, litigation or other claims that generally affect the rights of its creditors.

Article 6.02 Except for the lawful authorization to sign and execute this Agreement, the Transferee's execution and performance of this Agreement will not violate its business license, shareholder agreement, limited partnership agreement, articles of association (as applicable) or similar organization documents and will not violate any relevant laws or any government authorization, or any other agreement to which it is a Party (or binding it). In addition, there is no occurred and unsettled litigation, arbitration or other judicial or administrative proceedings which will affect its ability to perform any of its obligations under this Agreement.

The source of the funds used by the Transferee to pay the first part of the Transaction Consideration is legal. There is no violation of any applicable laws and regulations, and no claim against or liability of the Company will be incurred.

Article 6.04 The execution, delivery and performance of this Agreement and being a Party to this Agreement shall not violate or contravene any laws, regulations or government directives applicable to any of its assets, property or business.

## Article 7 liability for breach of contract

Article 7.01 If any Party violates the provisions hereof and causes any loss to the other Parties, it shall bear the corresponding liability for compensation and pay all the litigation costs including the lawyer's fee incurred by the other Parties. In case of late payment, the default Party shall pay liquidated damages to other Parties at five over ten thousand of the unpaid amount for each day of delay.

## Article 8 Miscellaneous

## Article 8.01 Interpretation and Interpretation Principles

Exhibit 4
Page 28

(a) In this Agreement, "shall" and "should" are mandatory and have the same meaning as "must"; "may" is authoritative, the actor has the right to decide to act or not to act. The Party enjoying a right may exercise or waiver on the right, and the freedom to choose and decide lies with that Party.

(b) "Writing" means any form of recordable information that can be identified by normal means of visualization, including but not limited to fax, electronic transmission, e-mail, SMS, letters, etc.

(c) References to or use of "hereunder" include all terms of this Agreement and its items, objectives, sentences, phases and words. "Article" includes and only includes the specified article and the paragraphs, items, sentences, phrases and words thereof. The "Clause" includes and only includes the specified Clause and all the items, sentences and words thereof, "Items" "Includes and includes only the specified items and all the items, sentences, phrase and words thereof.

(d) References to "Parties" shall include all Parties listed in the preamble to this Agreement, and the Parties shall only assume individual, independent and non-joint legal obligations with respect to their own rights and obligations under this Agreement (unless otherwise expressly agreed).

(e) "Including" or "including but not limited to", is merely used as an enumeration and shall not to be construed as limiting, restricting, or excluding any other includible items than those enumerated.

(f) "Delivery" means the legal fact that movable objects such as movable property or right certificates are transferred between entities.

(g) "Law" means the law that applies generally or specifically to a particular matter under this Agreement. Subject to the provisions on governing law under Article 8.12 hereof, references to "applicable law" refer not only to the laws enacted and enforced by the specific national or regional legislature in accordance with the applicable procedures, but also the normative documents enacted by local legislature, the state or local judicial organs or administrative organs in accordance with the applicable procedures and generally accepted by the country or region as legally binding, regardless of whether they are named as laws, norms, regulations, rules, decisions, orders, opinions, notices or other. These laws shall be implemented, enforced and universally legally binding at the time of signing this Agreement, as amended and revised by the competent authorities from time to time.

(h) "Judgment" means the judgment or ruling made by a court of competent jurisdiction in accordance with the applicable procedural law and substantive law; or the arbitration award made by the arbitral tribunal of competent jurisdiction in

Exhibit 4
Page 29

accordance with the applicable arbitral proceedings and substantive law agreed upon herein.

(i) Any reference to "proceedings" shall include litigation proceedings and arbitration proceedings. Litigation proceedings shall include criminal, civil and administrative litigation proceedings; the arbitration proceedings shall include labor arbitration proceedings, commercial arbitration proceedings, international arbitration proceedings and other types of arbitration proceedings.

(j) Both "within" and "in" shall include this number/day; "over" shall not include this number/day.

(k) Where any amount and number are used, in case of inconsistency between the capitals and lower-case letters, or inconsistency between the Arabic numerals and the Chinese numerals, the capitals or Chinese number shall prevail.

(l) Any reference to "day" means a calendar day, starting from 0:00 am Beijing time until 24 hours later. References to "working days" or "business days" means any day or days other than Saturdays, Sundays and holidays, rest days in accordance with the applicable laws of the People's Republic of China or other countries or regions. Except as otherwise required by the context, if any of the rights or obligations under this Agreement are to be exercised or performed on a non-working day, the exercise or performance shall be extended to the first working day after that date. "Day" includes the day, and "next day" is the day following the alleged day.

(m) Any reference to "yuan" or "YUAN" means the common currency of the People's Republic of China. References to "dollars" refer to the statutory common currency of the United States of America. Unless otherwise expressly agreed to use US dollars or other currencies, any payment obligations under this Agreement shall be denominated, settled and paid in RMB.

(n) Any reference to "Chinese" shall mean the simplified Chinese characters commonly used in the mainland of the People's Republic of China in conformity with the standards for the use of Chinese languages and characters issued by the State Language Commission of the People's Republic of China.

### Article 8.02 Confidentiality

(a) Confidential information under this Agreement, (i) for any individual, confidential information shall include the information contained in the Resident Identity Card of the People's Republic of China, other national or regional passport and other identification documents, such as the person's telephone number, mobile phone number or other contact information, home address, office address, marriage status, property information, etc. (ii) for any entity, confidential information shall

Exhibit 4
Page 30

include its patented technology, software source code, know-how, trade secrets, product development plan, pricing strategy, business method, investment, acquisition, reorganization, bank loan, bond issuance, listing plan, employee recruitment plan, financial accounting information, etc.; (iii) for any matter or Transaction under this Agreement, confidential information shall include pre-contact, negotiation, meeting, conference, communication, mail, letter, fax and the drafting, modification, negotiation, signing, payment, delivery of or under the transaction agreement (including this Agreement),etc.; (iv) for the above information or other information, against which appropriate confidentiality measures have been taken, or have been identified as "confidential", which the information holder is unwilling to disclose or make it known by others, and the disclosure or known to others of which will cause economic loss to or other significant adverse effects on information holder shall constitute the confidential information under this Agreement.

(b) Unless compulsorily disclosed, anyone who acquires, receives, saves, uses, copies and transmits confidential information is obliged to take appropriate confidentiality measures so that they are not disclosed, revealed or known to others. "Compulsory disclosure" means the disclosure made according to legal, judicial or administrative requirements, including disclosure to any relevant government department or stock exchange in accordance with applicable laws or stock exchange rules. In the event of a mandatory disclosure, the disclosing Party shall, at the reasonable time prior to the disclosure and to the extent permitted by applicable law, consult with the confidential information provider and do its utmost to keep the disclosed information confidential. However, for the purposes of completion of this Agreement or the Transaction hereunder, one Party may disclose the confidential information to its affiliates or intermediary agencies such as legal counsel, financial advisors, etc., and shall ensure that the recipient of the information fully understands, knows and agrees to assume the same obligation of confidentiality as the disclosing Party. In addition, no Party may use confidential information in any way for any other purpose.

(c)For any information disclosed or permitted to be disclosed by either this Agreement or any Party hereto, becomes or has been publicly available at the time of disclosure for reasons not attributable to any Party or its affiliates, or is derived from any bona fide third party, the recipient of the information shall not assume confidentiality liability within the scope of the information obtained. However, in no event shall any information be deemed to be non-confidential solely due to any provision that no confidentiality liability shall be assumed.

## Article 8.03 Effectiveness, Amendment and Termination

(a) This Agreement shall become effective upon being signed and and/or stamped by the legal representatives or the authorized representatives of the Parties or by themselves ("Signature").

Exhibit 4
Page 31

(b) Upon signing on the signing page of this Agreement, each of the Parties shall be deemed to have fully understood and acknowledged the rights of the Parties and the terms and conditions hereof, agreed to perform all of the obligations hereunder after the entry into force of this Agreement, be willing to be bound by all of the terms and conditions hereof and assume any legal liability arising herefrom. The Parties agree that only affixing the official seal to the signature page or signatory place hereof without the signature of the legal representative or authorized representative, or the official seal being a non-contract special seal such as financial special seal, or signing this Agreement by the person authorized by the legal representative or failure of the signatory to obtain written authorization at the time of signature or after signature shall not affect the entry into force of this Agreement. Any objection to the validity of this Agreement on the grounds that there is only the seal without the signature, this Agreement is signed by other person than the legal representative, the seal is non-contract special seal or the representative is authorized shall be invalid.

(c) This Agreement shall not be amended without the agreement of the Parties. Any valid amendment shall be made in separate written supplementary agreement to this Agreement after reaching consensus .If any Party hereto initiates or files a lawsuit or arbitral proceedings, and the court, tribunal or arbitral tribunal of competent jurisdiction ultimately rules that any clause or wording of this Agreement is invalid or unenforceable ("Invalid Clause") and have to be modified, the Parties shall jointly complete the amendment through good faith negotiation and based on the basic principle of maximizing compliance with this Agreement, so that the matters proposed and the rights and obligations of the Parties hereunder can be completed and achieved to the maximum extent. If, within fifteen (15) days after the ruling takes effect, the Parties are still unable to reach an agreement on the amendment of this Agreement, then:

    (i)   this Agreement may be un-amended and such invalid clause shall be deemed and construed to have not been formulated or contained herein from the effectiveness of this Agreement; or,

    (ii) if the invalid clause actually constitutes the fundamental clause hereof, or the invalidity or non-existence of such clause will lead to the fundamental purpose of this Agreement being unfulfilled or uncontinued performance of this Agreement, this Agreement shall be terminated.

(d) Each Party hereto shall use its reasonable and best efforts to abide by and perform this Agreement. This Agreement shall not be terminated without the agreement of the Parties except

    (i) if any court, tribunal or arbitral tribunal of competent jurisdiction rules, in accordance with applicable law, that all or part of the terms hereof is invalid, revoked or unenforced, or if any government department

Exhibit 4
Page 32

decides to terminate all or part of this Agreement, this Agreement or the corresponding terms shall be terminated;

(ii) If any Party seriously violates this Agreement, which leads to the fundamental purpose of this Agreement being unfulfilled or uncontinued performance of this Agreement, this Agreement shall be terminated;

(iii) Termination in accordance with Article 7 of this Agreement.

(e) Under the above circumstances, the Party who decides to terminate the agreement shall issue a notice of termination to the other Parties and this Agreement shall terminate as of the effective date of the notice.

### Article 8.04 Transfer of Rights and Obligations

No rights and obligations under this Agreement may be transferred to any other third party without the unanimous consent of the other Parties. In case of the transfer of any rights and obligations, the Transferor shall notify the other Parties in writing and obtain their consents before proceeding with the transfer.

### Article 8.05 No Waiver

Except as otherwise provided by laws and regulations or as otherwise agreed in this Agreement, failure to exercise, being unable to exercise or delay in exercise of any of its rights, powers or remedies under this Agreement or obtained according to this Agreement shall not constitute the waiver on such or any other rights, powers or remedies. The waiver on part of the rights by any Party shall not constitute waiver or exemption from other rights that are not expressly waived.

### Article 8.06 Notice

(a) Unless otherwise agreed, all notices, complaints, claims, demands and other information communicates ("Notices") under this Agreement shall be made in writing and delivered by hand, courier, fax, or registered mail (postage prepaid and return receipt required).Notwithstanding the foregoing, if the Parties send notice by electronic communication in accordance with commercial practices or past transaction habits and the recipient raises no objection, such notice shall be deemed to have the same legal effect as the written notice. For the purposes of this Agreement, the so-called electronic communication means the use of instant messaging methods such as e-mail, messages of mobile phones and other mobile communication devices, WeChat, QQ or SKYPE to transmit information or to issue notifications. In case of agreement on electronic communication, the recipient shall provide an accurate number or account to ensure that the notice can be delivered in time. The notice shall

Exhibit 4
Page 33

be sent to the address provided by the Parties on the signing page of this Agreement, or other address changed after this Agreement is signed, as long as the Party changes the address according to the actual situation and immediately informs the other Party of the changed address. The notice shall specify the matters involved, the completion requirements and conditions, and the deadline, and shall be written in Chinese. If the notice is used to report an incident, it shall state the time, place, process, cause and result of the incident and provide evidence. In the case of a correction notice, specific errors or defects shall also be indicated.

(b) A notice sent under this Agreement shall be deemed to be served validly ("Service") if any of the following conditions are satisfied:

(i) if sent by electronic communication, the notice shall be deemed to be validly served on the day when the email is successfully sent actually or as indicated;

(ii) if delivered by a person, the notice shall be deemed to be validly served on the date of delivery by the person;

(i) if sent by registered mail, the notice shall be deemed to be validly served on the seventh day after the date of mailing (by postmark);

(iv) if sent by courier, the notice shall be deemed to be validly served on the third day after the delivery of it to the courier service.

(c) In the case of any of the above-mentioned services, if the recipient informs the sender on the day following the date of service and expressly indicates that no notice has been received, the notice shall be deemed not to have been served and the Parties shall immediately negotiate and determine to resend the notice ("Resent Notice").The above mentioned service rules shall still be applicable to the Resent Notice. In the event that any notice cannot be severed due to untrue or inaccurate address provided by the recipient, or although the notice has been served, the recipient fails to accept process or understand the notice in a timely manner, resulting in the failure of the purpose of the notice and losses to the recipient ("Failure of Notice"), the recipient shall bear all losses; if the sender suffers any loss due to the Failure of Notice, the sender shall have the right to obtain compensation from the recipient.

### Article 8.07 Integrity

This Agreement shall constitute the entire agreement among the Parties with respect to the subject matter hereof and this Agreement shall have the legal effect of replacing any prior written or oral agreement among the Parties on the subject matter hereof.

Exhibit 4
Page 34

### Article 8.08 Severability

If any terms or provisions of this Agreement are deemed to be invalid or unenforceable in any jurisdiction, such terms or provisions shall be void only in such invalid or unenforceable scope, and the remainder shall not be affected and remain in full force and effect. The invalidity and unenforceability of any provision in a jurisdiction shall not affect its legal effect in other jurisdictions. It shall remain in full force and effect in other jurisdictions. In addition, if any provision of this Agreement is deemed to be invalid or unenforceable and will become effective or enforceable in case of deletion part thereof, then such provision shall be modified to the extent necessary to make it effective and enforceable.

### Article 8.09 Independent Clause

The provisions on the liability for breach of contract, confidentiality, notice, governing law and dispute resolution hereof shall have fully independent legal effect. The invalidity, cancellation or termination of the entire (or part) of this Agreement shall not affect the legal effect of such provisions, which shall continue to be valid.

### Article 8.10 Headings

Any headings in this Agreement are for convenience of reading only and do not constitute a summary or explanation of any of the terms of this Agreement, nor do they have any effect on the interpretation of any terms.

### Article 8.11 Languages

This Agreement is written, interpreted, retained and performed in the Simplified Chinese version of the People's Republic of China. Any Party may translate it into any other language according to the respective needs. However, in the event of any conflict, inconsistency or discrepancy in the writing, interpretation, and performance of the terms in any other language and in the language of this Agreement, the Chinese version shall prevail.

### Article 8.12 Governing Law and Dispute Resolution

This Agreement, any transaction, action, conduct or arrangement under this Agreement, and all rights and obligations of the Parties under this Agreement shall be governed by the laws of the People's Republic of China and shall be construed in accordance with such laws.

In the event of any dispute arising from this Agreement, any Party shall have the right to file litigation with the People's Court of competent jurisdiction at the place where this Agreement is signed.

Exhibit 4
Page 35

**8.13**

This Agreement is made in eight originals with each Party holding one (1) original, and the remaining (2) originals shall be used for registration with the registration authority (if required), each of which shall have the same legal effect.

(The remainder is left blank intentionally)

Exhibit 4
Page 36

**(Signature Page of the Equity Transfer Agreement)**

Signed by: **Shanghai Zheyun Business Consulting Partnership (Limited Partnership) (Official Seal)**

signature:

Position:

Signatory: Wu Meng

signature

Signed by: **Beijing Dongfang Cheyun Information Technology Co., Ltd. (official seal)**

signature:

Position:

Signed by: **LETV Holdings (Beijing) Co., Ltd. (official seal)**

signature

Position:

Signed by: **Taoyun Capital Group Co., Ltd. (official seal)**

signature:

Position:

Signed by: Jia Yueting

signature:





Exhibit 4
Page 37

吴孟

与

上海哲蕴商务咨询合伙企业（有限合伙）

关于

北京东方车云信息技术有限公司

---

# 股权转让协议

---

2017 年 6 月 30 日

Exhibit 4
Page 38

# 北京东方车云信息技术有限公司
# 股权转让协议

本《股权转让协议》（以下称为"**本协议**"）由以下各方（单称为"**一方**"，合称为"**各方**"）于 2017 年 6 月 30 日在中国北京市东城区签署：

**受让方：上海哲蕴商务咨询合伙企业（有限合伙）（"哲蕴"）**

住所地：上海市浦东新区周市路 416 号 4 层

**转让方：吴孟**

身份证号：14273319730105007x

**标的公司/公司：北京东方车云信息技术有限公司**

住所地：北京市丰台区南四环西路 188 号十六区 1 号楼七层-1(园区)

**一揽子借款之债务方：乐视控股（北京）有限公司（"乐视控股"）**

住所地：北京市朝阳区姚家园路 105 号 3 号楼 10 层 1102

**一揽子借款之债权方：韬蕴资本集团有限公司（"韬蕴资本"）**

住所地：

**乐视实控人：贾跃亭**

身份证号：

Exhibit 4
Page 39

鉴于：

（1）北京东方车z3信息技术有限公司（"**标的公司**"）是一家依据中国法律成立的且有效存续的有限责任公司，法定代表人为彭钢，成立日期为2010年5月21日，截止本协议签署日其注册资本金为1,100万元人民币，所有股东均已全部实缴出资完毕，标的公司及Easy Go Inc.（Cayman）（"**Easy Go**"）共同作为提供预约用车服务的电子商务平台易到用车（"**易到集团**"）的唯一知识产权持有方和运营实体。

（2）吴孟（"**转让方**"），中国公民，系标的公司的控股股东及乐视控股关联方，合法持有标的公司66.67%的股权。

（3）上海哲蕴商务咨询合伙企业（有限合伙）（"**受让方**"或"**哲蕴**"）系一家依据中国法律合法成立且有效存续的有限合伙企业。

（4）乐视控股（北京）有限公司（"**乐视控股**"）是一家依据中国法律成立的且有效存续的有限责任公司，乐视控股作为本协议第2.02条（b）款所述一揽子借款之债务方。

（5）贾跃亭，作为乐视控股及其他相关主体实际控制人（"**乐视实控人**"），直接或间接控制包括但不限于，乐视控股（北京）有限公司、乐视移动智能信息技术（北京）有限公司、乐视体育产业发展（北京）有限公司、乐乐互动音乐文化发展（北京）有限公司、乐视音乐文化产业发展（北京）有限公司，北京百瑞文化传媒有限公司，以及Lucky Clover（以上乐视实控人直接或间接控制的上述公司统称"**乐视相关主体**"）。

（6）韬蕴资本集团有限公司（"**韬蕴资本**"），是一家依据中国法律成立的且有效存续的有限责任公司，法定代表人为温晓东。

（7）转让方拟按照本协议的条款和条件将其持有的标的公司66.67%的股权（"**标的股权**"）转让给受让方，同时乐视实控人应促使Easy Go的控股股东Lucky Clover Limited（"**Lucky Clover**"）将其持有的Easy Go 66.67%的股权（"**Easy Go股权**"）转让给韬蕴资本指定境外关联方，并另行签署相应境外股权转让协议。

（8）韬蕴资本及其关联方与乐视实控人、乐视相关主体之间就一揽子借款（"**一揽子借款**"）的部分或全部债权中用于抵扣标的股权及Easy Go股权交易对价（合称"**本次交易**"）已达成共识。

有鉴于此，各方经友好协商，本着平等互利的原则，根据《中华人民共和国合同法》、《中华人民共和国公司法》等相关法律法规，就上述股权转让及一揽子借款中相关债权作为本协议项下本次交易交易对价的支付等事宜，订立本协议并拟定如下条款，以资共同遵守。

## 第1条  股权转让及受让

### 第1.01款  易到集团估值

Exhibit 4
Page 40

在本次交易前，易到集团估值截止本协议签署日转让方、受让方、韬蕴资本、乐视实控人、乐视相关主体同意按照 6.6 亿美元计（1 美元兑 6.80 元人民币汇率换算合计为 44.88 亿元人民币），但以本协议签署后受让方完成本协议第 1.02 款（b）条所述尽职调查且不存在足以影响本次交易的重大不利事件为前提。

### 第1.02款 交易对价、尽职调查及交易对价调整

(a)   交易对价：

本次交易转让股权为转让方合法持有的标的公司 66.67%的股权（**"标的股权"**）及 Easy Go 的控股股东 Lucky Clover 合法持有的 Easy Go 66.67%的股权（**"Easy Go 股权"**），受让方同意以 4.4 亿美元（1 美元兑 6.80 元人民币汇率换算合计为 29.92 亿元人民币）的总对价（**"交易对价"**）进行收购，其中本次交易完成后标的股权由受让方持有，Easy Go 股权由韬蕴资本指定境外关联方持有。但本协议签署后将由受让方完成独立的尽职调查，且本协议的生效以不存在足以对本次交易产生重大不利影响为前提。

(b)   尽职调查：

在本协议签署后，受让方将对易到集团进行全面的法律及财务尽职调查（**"尽职调查"**），转让方、标的公司、乐视实控人保证尽职调查提供其所需的相应材料和必要协助，其中应包括易到集团未来 3 年的财务预测数据。

(c)   对易到集团估值和交易对价的调整：

截止本协议签署日，转让方、标的公司、乐视实控人保证已充分披露的易到集团总负债金额应不超过 23 亿元人民币，如易到集团存有超过 23 亿元人民币的其他未清偿债务的，包括但不限于尚未清偿的银行借款、民间借款、其他欠款或任何或有债务的（合称**"超额未清偿负债"**），将全部由转让方、乐视控股和乐视实控人承担连带清偿责任。届时将根据专业中介机构的建议，受让方可就易到集团估值、标的股权及 Easy Go 股权交易对价进行相应调整，并可从受让方支付的交易对价中扣减相应价款，或向相关连带责任人追偿。

### 第2条 交割

### 第2.01款 交割时间及地点

(a)   各方应于本协议文首所述日期在中国北京市东城区签署本协议。

(b)   本协议签署生效后四十五个工作日内，完成全部转让标的股权的工商变更登记。

(c)   本协议签署生效后，在满足本协议约定的各项条件的前提下，受让方应按本协议第 2.02 款-2.03 款约定日期及方式进行债权债务的抵消及向标的公司进行付款（**"付款"**）。

Exhibit 4
Page 41

### 第2.02款 交易对价的抵扣安排

本次交易应为承债式收购，交易对价分为两部分：

(a) 第一部分交易对价为债务承担部分，受让方同意承担的易到集团总负债金额不超过 23 亿元人民币。在办理完毕标的股权及 Easy Go 股权转让的工商变更登记后，则视为受让方己承担该部分债务。

(b) 第二部分交易对价为债权抵扣部分，韬蕴资本及其关联方与乐视实控人、乐视相关主体之间就一揽子借款债权权中的部分，即共计 6.92 亿元人民币抵扣本次交易交易对价的 6.92 亿元人民币。在本协议签订生效后，上述债权即视为抵扣完毕。

(c) 转让方、乐视实控人在此明确并确认，上述两部分事宜履行完毕后，即视为受让方已完成全部交易对价的支付。

### 第2.03款 对标的公司的支付安排

就本协议第 2.02 款（b）项债务承担，为解决易到集团中标的公司的经营性现金流不足，受让方将向标的公司提供数笔款项支付，具体各笔款项支付时间由受让方与标的公司另行协商确定，但第一笔款项 4.3 亿元人民币应在本协议签订后 2 个工作日内支付。

标的公司名下的指定收款账户如下：

> 账户名称：北京东方车云信息技术有限公司
> 开户行：平安银行上海安亭支行
> 账号：11015642476000

标的公司应保证本条所述款项支付应全部用于清偿易到集团不超过 23 亿元人民币的总债务。同时上述总债务中所欠除转让方、乐视实控人及乐视相关主体外的第三方债务应最优先进行清偿（"**第三方债务**"），在第三方债务完全清偿完毕前，不得向转让方、乐视实控人及乐视相关主体进行清偿。

### 第2.04款 费用及税金

(a) 本次交易的相关费用，由各方承担各自相应的费用。

(b) 各方应当依所适用法律承担应由各方自行承担的因交易而发生的税金，依法必须由一方履行代扣代缴义务的除外（但是一方主张且实际履行该等代扣代缴义务时应提前举证相关法律依据并获得其他方同意）。

## 第3条 标的股权、Easy Go 股权变更

### 第3.01款 增资

Exhibit 4
Page 42

在本协议签订生效后至履行本协议第 3.02、3.03 款完成前，转让方或乐视控股应完成对标的公司 2.3 亿美元增资的工商变更登记事宜。

### 第3.02款  标的股权工商变更

在本协议签订生效后四十五个工作日内，标的公司应当在工商管理登记机关办理完毕股权转让涉及的工商变更登记事宜，在获得工商变更登记后换发标的公司新《企业法人营业执照》的复印件（应加盖公司公章）应递交给标的公司。

对于工商变更事宜，各方应给予相应的协助（如需）。

### 第3.03款  Easy Go 股权变更

在本协议签订生效后三个工作日内，各方应促使韬蕴资本指定境外关联方、Lucky Clover、乐视实控人完成境外股权转让协议签订及生效，并于境外股权转让协议约定期限内完成 Easy Go 股权变更登记。

对于变更事宜，各方应给予相应的协助（如需）。

## 第4条  股权回购

### 第4.01款  股权回购

经受让方、韬蕴资本指定境外关联方、转让方、乐视实控人等利益相关方协商一致，经各方认可的时间，转让方可以届时协商一致的合理的价格（暂定 15%年化利率）主张回购部分或全部股权（"回购"）。

## 第5条  转让方的陈述与保证

### 第5.01款  转让方是完全民事行为能力人。

### 第5.02款  转让方拥有所有必要的权力、授权与能力签署并交付所有交易文件，履行其在本协议及其他交易文件项下的义务，以及对其法律后果承担法律责任。每一份交易文件经签署并交付后即构成对公司及现有股东合法有效且具有法律约束力的义务，并可按照其各自条款执行。

### 第5.03款  转让方在此向受让方陈述及保证，除非事先另有声明，截至本协议签署日，转让方的陈述在重大方面均为真实、准确及完整的陈述。

### 第5.04款  转让方应及时获取公司对本协议的约定的股权转让的决议文件，以及其他股东放弃优先购买权的法律文件。

Exhibit 4
Page 43

第5.05款 转让方是标的股权的合法所有人，标的股权之上未设置质押等担保物权或任何其他第三方权利。

第5.06款 截至本协议签署日，转让方除已向受让方披露内容外，标的公司不存在任何导致或可能导致税收争议、税收处罚或相关司法程序的情形；标的公司未涉及任何争议、处罚或司法程序，包括但不限于任何诉讼、仲裁、行政程序、强制措施或执行程序等；标的公司并不存在未披露的超额未清偿债务或可能产生上述债务的事由；因本协议签署之日前原因产生的上述税收处罚、诉讼、仲裁、行政程序、强制措施、执行措施、超额未清偿债务等，由标的公司负责解决，但因此引发的标的股权上的责任及损害赔偿应由转让方承担。

第5.07款 本签署、交付和履行本协议以及及其作为一方就本协议不会：违反或抵触适用于其任何资产、财产或业务的任何法律法规或政府指令。

## 第6条 受让方的陈述与保证

第6.01款 受让方为依法设立并有效存续的企业法人，具有与订立及履行本协议相适应的民事主体资格及权利能力。本协议经各方正式授权、签署及交付，即构成对受让方的合法、有效并具有约束力的义务，且该义务可根据本协议的条款强制执行。受让方不受制于任何普遍影响其债权人权利的破产、重组、资不抵债、诉讼程序或其他诉求。

第6.02款 除需依法取得签署、执行本协议的授权外，受让方签署、履行本协议不会违反其营业执照、股东协议、有限合伙协议、章程（视适用情况而定）或类似组织文件的任何规定，不会违反任何相关法律或任何政府授权，不会违反其作为当事人一方（或受之约束）的其他任何协议，也不存在将影响其履行本协议项下任何义务的能力的、已经发生且尚未了结的诉讼、仲裁或其他司法或行政程序。

第6.03款 受让方用于支付交易对价第一部分债权抵扣的资金来源合法，不存在违反任何适用法律法规规定的情形，不会因此造成对公司的任何索赔或致使公司承担任何赔偿责任。

第6.04款 本签署、交付和履行本协议以及其作为一方就本协议不会：违反或抵触其组织文件的规定以及违反或抵触适用于其任何资产、财产或业务的任何法律法规或政府指令。

## 第7条 违约责任

Exhibit 4
Page 44

第7.01款　任何一方违反本协议的约定，给对方造成任何损失，均应承担相应的赔偿责任，并支付对方因此支付的包括律师费在内的所有诉讼费用。若任何一方逾期支付任何应付款项，则每逾期一日，应向对方支付应付未付款项万分之五的罚息。

## 第8条 他项条款

### 第8.01款 解释及解释原则

(a)　本协议中，"应"、"应当"均为强制性的，与"必须"具有同等含义；"可以"为授权性的。行为人有权决定作为，也有权决定不作为。凡属一方之权利，该方既可以行使，也可以不行使，选择及决定的自由在于该方。

(b)　"书面"系指能通过正常可视化手段予以辨认的可记录信息的任何形式，包括但不限于传真、电子传输、电子邮件、手机短信、信函等。

(c)　凡提及或用到"本协议项下"包括本协议全部条款及其项、目、句、词及字。"条"包括且仅包括指定该条全部条、款、项、目、句，及其短语、词语和单字，"款"包括且仅包括指定款及其全部项目句及字词短语，"项"包括且仅包括指定条款指定项及其全部目、句及字词短语。

(d)　凡提及"各方"，应包括本协议序言部分所列全部各方，各方就其自身在本协议项下的权利与义务仅仅承担个别的、独立的且非连带的法律责任（除非另有明确约定）。

(e)　"包括"或"包括但不限于"仅充当列举之用，不应被解释为限制、限定或排除其后列举例证之外其他任何可包括项或应包括项。

(f)　"交付"系指动产或权利凭证等可移动物在主体之间转移占有之法律事实。

(g)　"法律"系指普遍或特别适用于本协议项下特定事项的法律。在满足本协议第8.12款有关管辖法律之约定条件下，凡提及"所适用法律"，均不仅仅指由特定国家或地区立法机关依所适用程序制定并颁布实施的法律，亦包括由地方立法机关、国家或地方司法机关或行政机关依所适用程序制定、颁布且被该国家或地区普遍接受为具有普遍性法律约束力的规范性文件，无论其被命名为法律、条例、规定、规则、决定、命令、意见、通知或是其他。该等法律在本协议签署时应正被实施、执行且具有普遍性法律约束之效力，并包括有权机关不时颁布实施的法律修正案或不时修订后颁布实施的新法律。

(h)　"裁决"系指有管辖权之法庭依所适用法律规定程序法及实体法做出地判决或裁定；或有管辖权之仲裁庭依本协议约定选择适用的仲裁程序及实体法做出地仲裁裁决。

(i)　凡提及"诉讼程序"，应包括诉讼程序及仲裁程序。其中，诉讼程序应包括刑事诉讼、民事诉讼及行政诉讼；仲裁程序应包括劳动仲裁、商事仲裁、国际仲裁等各类仲裁。

Exhibit 4
Page 45

(j)　　"内"、"之内"均包括本数/日；"超过"均不包括本数/日。

(k)　　凡使用任何金额及数字，若大小写不一致，或阿拉伯数字与中文数字不一致，均应以大写或中文数字为准。

(l)　　凡提及"日"，系指一个日历日，从北京时间凌晨零点开始计算，经过24小时为一日。凡提及"工作日"或"营业日"，系指除了周六、周日或中华人民共和国或其他国家或地区根据所适用法律确定为节日、假日及休息日以外之任何一日或多日。除上下文另有要求外，如本协议项下任何权利或义务可供行使或履行之日为非工作日，则该项权利或义务应顺延至该日之后第一个工作日行使或履行。"之日"包括当日，"次日"为指称当日之第二日。

(m)　　凡提及"元"或"圆"，系指中华人民共和国通用货币人民币元。凡提及"美元"，系指美利坚合众国法定通用货币。除非明确约定使用美元或其他货币，本协议项下任何付款义务均应以人民币计价、结算及支付。

(n)　　凡提及"中文"，应指中华人民共和国大陆地区通用的符合中华人民共和国国家语言文字工作委员会颁布实施的汉语言文字使用规范的简体汉字。

## 第8.02款　保密

(a)　　本协议项下保密信息，(i) 就任何个人而言，包括《中华人民共和国居民身份证》或其他国家或地区《护照》等身份证件上全部记载信息，该人士电话号码、手机号码或其他联系方式、家庭住址、办公地址、婚姻、财产信息等；(ii) 就任何单位而言，保密信息包括其专利技术、软件源代码、专有技术（know-how）、商业秘密、产品开发计划、定价策略、经营方式、投资、受让、重组、银行贷款、发债、上市计划、员工招收计划、财务会计信息等；(iii) 就本协议项下任何事项或交易而言，包括前期接触、洽谈、见面、会议、通讯、邮件、信函、传真、交易协议（包括本协议）起草、修改、磋商、签署、付款、交割等；(iv) 上述信息或其他信息，若已被采取适当保密措施，或已被标识"保密"字样，信息持有方不愿意公开或被他人知悉，且若被公开或被他人知悉，将对信息持有方造成经济损失，或造成其他重大不利影响，则构成本协议项下保密信息。

(b)　　除非被强制披露，任何获得、接受、保存、使用、复制及传递保密信息者，均有义务采取适当保密措施，以使其不被披露、泄露或被他人知晓。所谓强制披露，系指根据法律、司法或行政机关要求不得不予以披露，包括根据所适用法律或证券交易所规则向任何有关政府部门或证券交易所披露。若发生强制披露，披露一方应在其力所能及且所适用法律允许范围内，于做出此种披露前合理时间内，与保密信息提供方磋商，并尽最大努力对所披露信息进行保密化处理。然而，为完成本协议项下或交易之目的，一方可以将保密信息向其关联方或法律顾问、财务顾问等中介机构进行披露，但应确保信息接受方充分知晓、理解并同意承担保密义务，该等义务其法律责任大小应与披露方一致。此外，各方均不得为任何其他目的、以任何方式使用保密信息。

(c)　　若存在任何信息，已被本协议或本协议任何一方同意或允许披露，或在披露之时已经可公开获得或已被公开获得且该等公开非可归责于任何一方或其关联方，或其获得信息渠道来源于任何善意第三方，则信息获得方在获得信息范围内不承担保密责任。但是，任何情形下，任何信息不应仅因任何规定可以不承担保密责任而被认定为非保密信息。

Exhibit 4
Page 46

### 第8.03款 生效、变更与终止

(a)   本协议经各方法定代表人或其授权代表人或本人签字及/或盖章("签署")后正式成立并正式生效。

(b)   各方一经于本协议签署页签署，即视为其完全理解、承认本协议各方在本协议项下约定条款及条件的权利，同意在本协议生效后履行本协议项下全部及各项义务，愿意受该全部各项条款及条件的约束，并承担由此产生的任何法律责任。各方同意，在本协议签署页或标明签章处仅加盖公章而无法定代表人或其授权代表人签字，或者公章为公司财务专用章等非合同专用章，或者法定代表人未亲笔签字而授权他人签字，或者任何签字人于签字时或签字后未获得书面授权等情形均不影响本协议的生效。任何以本协议仅有盖章而无签字、非法定代表人签字、非公司合同章或授权代表人未获授权等为理由对本协议效力提出的异议均为无效。

(c)   本协议非经各方协商一致不得修改变更。协商一致后，另行签署书面补充协议，对本协议的修改方为有效。若因本协议任何一方提起或发起诉讼或仲裁程序，最终致使本协议任何条款或措辞被有关合法管辖权的法院、法庭或仲裁庭依法裁决无效或不予执行（"无效条款"），需要对本协议任何条款或措辞进行修改，各方应通过善意协商，以最大程度符合本协议之根本目的为基本原则，共同完成修改程序，从而使得本协议中所拟议事项以及各方权利义务能最大限度按照本协议签署之初所拟定计划完成与实现。若在裁决生效之后十五（15）日以内，各方仍无法就协议修改达成一致意见，则：

    (i)   本协议可不做任何修改，且该等无效条款应被视为及解释为本协议自始未拟定或包含该等无效条款；或，

    (ii)   若无效条款事实上构成本协议根本条款，或无效条款无效或自始不存在将致使本协议根本目的无法实现，或致使本协议无法继续履行，则本协议终止。

(d)   本协议各方应尽自己合理的最大努力遵守并履行本协议各项约定，除以下情形之外，本协议非经各方协商一致不得终止：

    (i)   若任何有管辖权的法院、法庭或仲裁庭依所适用法律裁决本协议全部或部分条款无效、被撤销或不予执行，或者任何政府部门决定终止本协议全部或部分条款，则本协议或相应条款应当终止；

    (ii)   若任何一方严重违反本协议约定，导致本协议根本目的无法实现或本协议无法继续履行，本协议应当终止；

    (iii)   依本协议第7条而终止。

(e)   在上述情形下，决定终止协议的一方应当向对方发出终止通知，通知生效之日起本协议即行终止。

### 第8.04款 权利与义务转移

非经各方一致同意，本协议项下任何权利义务均不得转移给其他任何第三方。任

Exhibit 4
Page 47

何权利义务的转移，转让一方均需事先书面通知其他方，征得同意后方可进行。

### 第8.05款 不放弃

除非法律法规另有规定或本协议另有约定，如任何一方不行使、或未能行使、或延迟行使其在本协议下或根据本协议而获赋予的任何权利、权力或补救行动，不构成该方放弃该等或任何其他权利、权力或补救行动。任何一方放弃其部分权利，不构成其对其他未明确放弃之权利的放弃或豁免。

### 第8.06款 通知

(a)    除非另有约定，所有本协议项下通知、诉求、权利主张、要求及其他信息交互（"通知"），均应以书面形式做出，并以专人递交、快递服务、传真、或挂号邮件（邮资预付并要求回执）交付。尽管如此，若各方按照商业惯例或过往交易习惯通过电子通讯方式进行通知，且接收方对此并无异议，则该等通知应视为与书面通知具有同等法律效力。为本协议之目的，所谓电子通讯方式，系指使用电子邮件、手机等移动通讯设备短信息、微信、QQ 或 SKYPE 等即时通讯方式传递信息或发出通知。若约定以电子通讯方式进行通知，则接收方应当提供准确号码或账户，保证通知能够及时送达。通知应当发送到各方于本协议签署页所提供地址，或协议签署后变更地址，只要任何一方根据实际情形变更地址，且将变更后地址即时通知于其他方。任何通知均应当明确所涉协议事项内容、完成要求及条件、截止时限，以中文书写。通知若为报告事件，除应当明确事件所涉时间、地点、经过、起因、经过及结果外，还应当尽合理努力提供相应证据。若为更正通知，还应指出具体错误或瑕疵。

(b)    依本协议所发送的通知在满足下列任意情形时即为有效送达（"送达"）：

(i)    若以电子通讯方式发送通知，则通知以电子邮件等成功发送或显示发送成功之时日视为有效送达；

(ii)   若由专人递交，则在专人递交之日视为有效送达；

(iii)  若以挂号信件发出，则在寄出日（以邮戳为凭）后第七日视为有效送达；

(iv)   若以快递方式发送，则于交与快递服务发送后第三日视为有效送达。

(c)    就上述任何一种送达而言，若接收人于视为送达日之次日通知发送人并明确表示未收到发送通知，则通知应认定为未送达，双方应立即协商并确定重新发送通知（"重发通知"）。 重发通知仍适用上述视为送达规则。 就任一通知而言，若因接收方提供地址不真实或不准确，致使通知不能送达，或尽管通知已经送达，但接收方未及时接收、处理或知悉通知内容，导致通知之目的未能实现（"通知失败"），使接收方遭受损失，则应由接收方自行承担全部损失；若因通知失败导致发送方损失，发送方有权就此从接收方获得赔偿或补偿。

### 第8.07款 完整性

本协议构成各方之间就协议事项所达成之完整协议，本协议具有取代各方之前就

Exhibit 4
Page 48

协议事项所达成任何及全部其他书面或口头协议之法律效力。

### 第8.08款 可分割性

若本协议任何条款或规定在任何司法辖区被视为无效或不可执行，则该等条款或规定应仅在该等无效或不可执行的范围内无效，其余部分不因此受到影响，应当仍旧完全有效。本协议任何条款在某一个司法辖区无效或不可执行，不影响其在其他司法辖区内的法律效力，其在其他司法辖区仍应完全有效。此外，若本协议任何条款被视为无效或不可执行，但若将其部分删除则变为有效或可执行，则该等条款应在最小范围内做出必要修改以使其有效并可执行。

### 第8.09款 独立条款

本协议违约责任条款、保密条款、通知条款、管辖法律和争议解决条款，在法律效力上具有充分独立性，本协议全部（或部分）无效、被撤销或终止，不影响该等条款的法律效力，该等条款仍继续有效。

### 第8.10款 标题

本协议中，任何标题仅为阅读方便，不对本协议任何条款构成总结或解释，也不对解释任何条款产生任何影响。

### 第8.11款 语言

本协议用中华人民共和国通用简体中文书写、解释、留存及履行。任何一方均可就各自需要翻译成其他任何语言文字。但是，若任何其他语言文本之文义与本协议语言文本之文义在书写格式、解释及履行过程中发生任何冲突、不一致、相违背等情形，均应以中文文本为准。

### 第8.12款 管辖法律和争议解决

本协议、本协议项下任何交易、行动、行为或安排，以及各方在本协议项下全部权利及义务，均应受中华人民共和国法律管辖，根据该等法律进行解释。

本协议项下发生任何争议，任何一方均有权向本协议签署地有管辖权人民法院提起诉讼。

### 第8.13款 文本

本协议正本捌份，各方各执壹（1）份，剩余贰（2）份用于登记机关备案（如需），每份均具有同等法律效力。

（以下有意留白）

Exhibit 4
Page 49

（本页为《股权转让协议》的签字页）

签署方：上海哲萜商务咨询合伙企业（有限合伙）（公章）

签字：

职务：

签署方：吴孟

签字：

签署方：北京东方车云信息技术有限公司（公章）

签字：

职务：

签署方：乐视控股（北京）有限公司（公章）

签字：

职务：

签署方：韬蕴资本集团有限公司（公章）

签字：

职务：

签署方：贾跃亭

签字：





Exhibit 4
Page 50